We'll turn to United States v. Leon, 22-1070. Did I pronounce the name close? I'm sorry, Your Honor? Well, good, good, you didn't hear me. So state your name, because I'm not sure I'll pronounce it correctly. May it please the Court, Bretta Peary on behalf of Luis Leon. Sometimes a combination of innocent factors is enough to add up to reasonable suspicion when viewed through the eyes of a trained and experienced officer, but not all the time. For that to be the case, the officer has to explain how something that appears innocent on its face is in fact suspicious. Take suspicious travel plans, which this Court has identified as a category of things that can be included in the reasonable suspicion calculus. But it's not enough because of that for an officer to get up and say there were suspicious travel plans and sit down again. The officer has to explain why there was something about this defendant's explanation of his travel plans, perhaps in combination with where he was going and how long it was going to take, that transforms something that's innocent on its face into something that's suspicious. If the officer can't succeed in doing that, then we're just left with something that looks innocent and therefore can't contribute to reasonable suspicion. And that's what happened here. Trooper Gosnell observed a number of facts that appear innocent on their face, and he wasn't able to put together a coherent explanation for why any of those should contribute anything to reasonable articulable suspicion. Take the fact that Mr. Leon's driver's license was from Arizona, and he was driving a truck that was registered in Minnesota. The only explanation that Trooper Gosnell gave for why this seemingly innocent circumstance is suspicious of drug trafficking was that drug traffickers sometimes use third-party vehicles. And the reason drug traffickers use third-party vehicles, according to Trooper Gosnell, is it allows the driver to distance himself from the load of drugs that's in the car. Trooper Gosnell said at page 15 of Supplemental Volume 4, it's a defense. It allows the driver to say, It's not my car. I didn't know it was in here. Whatever the merits of that explanation for actual third-party vehicles, it falls apart completely on the facts of this case. Mr. Leon couldn't have been clearer that this wasn't a third-party vehicle. It was his truck. He bought it, the insurance was his name, and it was registered in his name. And Trooper Gosnell was able to verify that all those facts were true very quickly into this interaction. So Trooper Gosnell simply didn't give a rational explanation for why this was a suspicious factor at all. Added to that, as the government concedes on page 25 of its brief, Mr. Leon offered a plausible and innocent explanation for the discrepancy between the state where his driver's license was from and the state where the truck was registered. He was moving. He was from Arizona. He was in the process of moving to Minnesota. He bought a new truck there. So we have an explanation that would make it suspicious, that doesn't pan out, that doesn't make any sense. We then have a plausible explanation. So at this point, this factor should really fall by the wayside altogether and contribute nothing to the reasonable suspicion calculus. Added to that, the government really makes Mr. Leon's point by citing precisely one case in which the difference between the driver's license and the truck's registration contributed to reasonable suspicion, Pena. But in Pena, the fact that the driver's license was from one state and the car was registered in another was just the beginning of the problem. In Pena, the driver said he borrowed the car from his brother. It turned out it was registered to a woman. He disclaimed any knowledge of the woman, and when asked if he had permission to even drive the car, Mr. Pena just shrugged. So this is a case, the government's only case for this factor mattering at all, in which there were so many other things that loomed much larger and were much suspicious that, again, this factor is meaningless. But I do want to clarify something, which is that if the government were to file a 28J letter tomorrow listing a handful of other cases in which perhaps the difference between the state of registration and the state of the driver's license was taken into account, it still wouldn't help in this case. Because just like suspicious travel plans, the government would only be identifying a category of things that can matter if the officer can prove it up, and the officer failed to prove it up in this case. And so maybe in some other cases, some other officer could actually offer an explanation that made sense on the facts of the traffic stop that that officer was involved with. Not so here. Could I ask you, at what point did the reason for the traffic stop end and the need for reasonable suspicion of drug trafficking begin? At the moment, Trooper Gosnell asked for the mileage on the truck. Trooper Gosnell testified that the only reason he asked that question was that drug traffickers put a lot of miles on cars very quickly, and so he was asking to see if this confirmed the suspicion he was already forming that he was looking at drug trafficking. How did asking for the mileage measurably extend the stop? Well, the government, in its brief, says that it took about 20 seconds for this entire interaction. So Trooper Gosnell says, what's the mileage on your truck? Mr. Leon, having already explained that he just had the oil changed, looks on the windshield for the mileage, gives it to Trooper Gosnell, who decides that's suspicious, and says, just get it off the odometer for me. So it clearly measurably extended the stop. Twenty seconds. Twenty seconds. All right. But I would also like to say that that's only part of the problem. Under Rodriguez, any de minimis extension of the stop is a problem. The government hasn't cited any case law, and to their credit they conceded that this is when the measurement must take place. Let me just ask, why is it appropriate for an officer to ask for travel plans but not about mileage? Do travel plans really go to the rationale for the traffic stop to begin with? Judge Matheson, you're anticipating my next appeal. If it had been preserved in this case, I think there is an excellent argument to be made that asking about travel plans almost invariably extends the duration of the stop. But thus far, this Court has recognized that asking about travel plans is one of the ordinary incidents of a travel stop. I don't think it is. I don't think it makes sense under the doctrine. But A, it wasn't preserved in this case, and B, I think at this point it is recognized. But I think you're on to something important, Judge Matheson, which is this. Asking about the mileage on the car isn't just a problem because it takes time, whether it takes 2 seconds or 20 seconds or 40 seconds. It's a problem because the only reason under the Fourth Amendment that an officer can stop somebody who's driving down the road is because he has reasonable suspicion of a traffic infraction. That argument's been rejected by the Supreme Court. If it doesn't extend the period of time, you can ask any questions you want. That's simply not a Fourth Amendment interest. It did extend the time in this case. Okay, if you want to argue that, that's one thing. It's been conceded in this case. But the nature of the question is irrelevant to the Fourth Amendment issue. If it doesn't extend, I'll put it this way, perhaps a little more precisely. If it doesn't extend the time, if the officer's waiting for the license check to get back from the dispatcher or something like that, the officer can ask any questions he or she wants. That's not an issue. We will return then to the fact that the government has conceded that this extends the time of the traffic stop in this case. In that regard, I'm interested in what consequence that has for some of the other reasons the government is relying upon. Let's take the $500 that was paid for the vehicle, which seems like a pretty good deal. Is that even on the table? Because when did the officer learn that information relative to the question about mileage? Was it before or after? When did that happen? Well, it's not clear on the record in the first case, which was explicitly not part of the record in this case. So the government has only cited to testimony from the first case, which was an evidentiary hearing in front of a different judge. The government below moved to just put that record on for the second case. The district judge said, no, we're going to hear it de novo. I'm not going to rely on any of that evidence. It was a different district judge. So Trooper Gosnell didn't testify at all about the price of the vehicle on the record that's on appeal in this case. My answer, if we're looking at the earlier cases, it's not altogether clear when he found that out. It could be argued he found it out when he first looked at the registration as he was standing by the car. But the record also says he looked more closely at the registration when he went back and was in his car after asking about the mileage on the car. Is it a question of when he actually discovered the amount, or is it more appropriately a question of when a reasonable officer would have found out under these circumstances? In other words, he gets the manila envelope and starts going through it. We know that much. Right. What we don't know is if the $500 jumped out at him, if I'm understanding your answer. But does it really matter at what point he actually knows or when a reasonable officer would have discovered that? Well, it matters when he knew, because we look at what the officer knew at the time. We don't look at what some hypothetical better officer would have figured out at the same point. No, it's not a hypothetical better officer. It's what a reasonable officer. Why isn't it a reasonable officer test? Because we look at what this officer knew at the time on these facts. The facts that aren't available to the officer, to this officer at this time,  All right, so let's just come back to this question then. If the $500 is relevant to reasonable suspicion, is that something that's on the table or not? It is not, because it wasn't in the record of this case. And the district court, when she took the bench in this case, said, you guys both attached the transcripts from the prior hearing. I ruled that this is de novo, and I'm going to look at this evidence. I've skimmed them. I haven't looked at them. Trooper Gosnell didn't testify to the price in this case. The district court didn't identify the price in this case as a factor that she considered. Moreover, one of the problems with looking to the other case to supplement the record in this case, aside from the fact that I don't think we can do it, is that we don't know anything about this truck. The government gave us data from a different state, from a different time period, after a period of enormous inflation, and during a period during COVID, I think the court can take judicial notice that cars were hard to come by and prices went up. But we also don't know anything about the condition of this car. We don't know. It had a lot of miles on it. We don't know if it was in great shape. And we do know that Mr. Leon also said he acknowledged in the record in this case. That sort of brings mileage back into the relevance area, doesn't it? I mean, if the- But, Trooper- I realize that the dollar amount wasn't in the second suppression hearing, but if it is relevant, and now we're saying, well, maybe its relevance turns on the mileage. No, its relevance turns on whether- Its relevance as an abstract question is one thing, but it wasn't in the record in this case. No, I understand. It wasn't considered. You've made that point. Let me just ask you about the Epic check and what it revealed. Is that on the table? It is not. Because that happened after the mileage question. It clearly happened after the mileage question. And if you listen to the video of the traffic stop, it's also clear that the Epic search itself was interrupted by another digression. Trooper Gosnell was sitting in the car. He gets somebody from Epic on the line. Then Deputy Miller comes up to him, and Trooper Gosnell actually says, hold on a minute to the people running the Epic search, or who we're about to, and then turns to have this entirely gratuitous conversation with Deputy Miller about, well, I'm suspicious of this, and this doesn't look great to me. So it's sort of two simultaneous detours from the business of the traffic stop. And in any event, the government conceded below, before the district court, that there were some delays, and that talking to Deputy Miller, and that the Epic search were among them. So they conceded, if nothing else, that the Rodriguez moment had happened then. And so the results of the Epic search couldn't come in. Going back just very briefly to the price of the car, which, again, I don't think comes in, but what is in the record before this case is that Mr. Leon said, I got a great deal on a car. The people who sold it to my friend were co-religionists. He uses a term I can't pronounce. They were fellow term-I-can't-pronounce enthusiasts, but it refers to the fact that they're all Hare Krishnas. So he also offered a reason why he might have gotten a great deal on a car. So the evidence of the specific price is not in the record. The evidence that there was a great deal also has a reasonable explanation. I will reserve 23 seconds for rebuttal. I guess that means, by our precedent today, that's three or four minutes, but I'm not going to give you that much time, so don't count on it. Good morning, Your Honors. Michael Johnson for the United States. I'd like to start by stating that this court has held a number of times, and the Supreme Court as well, that reasonable suspicion may exist, even if it's more likely than not that the individual was not involved in any criminal activity. And this court has also held a number of times that this court defers to the trained law enforcement officer to distinguish between innocent and suspicious actions. And so with that framework, I'd like to talk about the two groups of evidence that are at issue here. The first group that I'd like to discuss is the evidence concerning the vehicle. I submit that the evidence concerning the vehicle is easier for this court to consider as contributing to a finding of reasonable suspicion, and that vehicle evidence places in context Mr. Leon's responses to Officer Gosnell's questions during the traffic stop. The evidence concerning the vehicle that we're relying on is the single key in the ignition, the manila envelope, the messy condition of the interior, the fact that the truck was registered in Minnesota and had Minnesota license plates, but Mr. Leon had an Arizona driver's license, and then also, finally, the price of the truck. Let me start by explaining how we can consider the price of the truck. Yes, Your Honor. If it wasn't on the record on which the district court made its decision, I don't see how we can consider it. As we indicated in our answer brief at page 27, and this was note four, that this court can affirm on any ground set forth in the record, and the transcript of the first suppression hearing that was conducted in front of Magistrate Judge Gallagher and which was reviewed by Judge Krieger, that transcript of the first hearing was on file in the second hearing before Judge Arguello. This was the supplemental volume one contains day one and day two of the transcript before Magistrate Judge Gallagher. That was on file in the record before Judge Arguello in the second case. What did Judge Arguello consider in that transcript? What did Judge Arguello say about the status of that transcript? She said, this is volume three at page seven, she said, quote, I have skimmed through the transcript. She skimmed through the transcript of the first hearing, so she was familiar with it. She didn't read it in detail, but she was aware of it, and she was familiar with the issues that were raised, and she was generally familiar with the testimony provided by the witnesses at the first hearing. I thought counsel said that the judges ended up doing this on the clean slate or something along those lines. The district court judge did say at the second hearing that she wanted to hear the witnesses and that she was going to issue her ruling after hearing the witnesses at the second hearing. But nevertheless, the transcript of the first hearing was on file in front of the district court at the second hearing, and the district court did state on the record at the second hearing that she did skim through that transcript. She was aware of it. She didn't take the bench that day without any knowledge whatsoever of the case. She was familiar with the case. She was familiar with the first hearing. She was aware that the magistrate judge had issued a recommendation to deny the motion to suppress. She was aware that the district court judge in the first case had issued an order denying the motion to suppress. And from the record of the first hearing, at what time did the officer learn the price of the truck in relation to the time that apparently everyone agrees the officer needed to have reasonable suspicion beyond what was necessary for the stop itself? The officer looked through the material in the manila envelope. Mr. Leon gave the officer the manila envelope and asked him to look through it. And the officer spent some time looking through the envelope. He indicated at time signature six minutes and 19 seconds of the video. He said, I think this is going to work. This is the title changeover. And so at that point in the video, the officer had located the title changeover. The title changeover on the face of that document indicated the purchase price that Mr. Leon paid for the vehicle, which was $500. And the officer, at six minutes and 30 seconds in the video, finished looking through the manila envelope. He completed his work at that point. And then at six minutes and 40 seconds of the video, that's when the officer asked Mr. Leon, quote, how many thousand miles are on it, referring to the truck. So the officer had the title changeover document, which contained on its face the price. And a reasonable officer at that point in time would, viewing that document, would understand that the price of the vehicle, $500, also contributed to the reasonable suspicion calculus. Well, do we know anything about the condition of the truck? And what was the mileage? He later learned that there were, I believe, there was, I believe, 191,000 miles on the vehicle. But the vehicle otherwise to the officer didn't appear damaged in any way. There was no indication of the record. So the officer testified about the condition of the vehicle? He testified as to the condition of the passenger compartment, that it was messy, that the things were strewn inside. In what context did he say that he didn't see any damage to the vehicle? He didn't report any damage to the vehicle. Oh, he didn't report any. Right. There was no indication that the vehicle was in any way malfunctioning. Was the vehicle impounded? I believe it was, Your Honor, yes. Is there any report on that showing the condition of the vehicle? I don't have that in the record. I don't. That is not in the record. I'm not aware that that's in the record in front of this court. Okay. It may be in the record at the district court, but it's not in the record here. And so just quickly going through the other evidence regarding the vehicle itself, the key, the single key in the ignition, also properly contributed to the reasonable suspicion analysis. The officer testified that he found the key suspicious because legitimate car owners would normally attach to the vehicle key ring the other keys, house keys or other keys that are necessary so that they're collected in one spot. And the officer also testified in the second hearing that the fact that there was a single key, not even on a key ring, just a key, suggested to the officer based on his training and experience that someone had just given him the key and said, here's the key for the car. And the officer testified in addition that organizers or coordinators of drug trafficking organizations use this method to provide vehicles for couriers and then registering and re-registering the vehicles once one courier finishes his or her work and then another courier starts in order to make it more difficult for law enforcement to track the vehicle to the drug organizer or drug kingpin. And the other evidence in addition is the backpack and the manila envelope, as we indicated in our answer brief. The issue with the backpack is significant because the officer testified that in his experience and training and encounters with drivers during the course of his work in drug interdiction on highways, that individuals would normally keep important documents such as the insurance and registration in a glove box or glove compartment and would not keep it in a manila envelope in a backpack in the front passenger area. So it's more the backpack, isn't it? You could see somebody having a manila envelope in their glove compartment. Exactly, Your Honor. It's the backpack because the backpack could be moved or displaced. But more important, the officer testified that the evidence suggested that a drug organizer or some higher official in the drug ring just handed him the backpack when he began his journey and said, here are the documents you need. They're in this backpack. Mr. Leone testified that he, rather, the officer testified that Mr. Leone provided him the envelope and appeared not to know what was through, what was inside the envelope. And Mr. Leone testified, or rather stated on the video, do you want to look through this referring to the manila envelope? And this is the video at four minutes and six seconds. This was additionally suspicious to the officer. And finally, the envelope contained the expired registration of a prior owner. And the officer found this suspicious as well, suggesting that somebody had given him the backpack with the envelope and had not removed the prior owner's registration. The officer could reasonably conclude that in a normal transaction where someone is purchasing a used vehicle, that the prior owner would not include the vehicle registration among the documents provided in the course of the sale. And then as to the messiness of the vehicle, we submit that that does contribute to the reasonable suspicion analysis. It's a factor. We're not placing undue weight on that factor, but it is a factor. And the officer did observe messiness. And this was relevant because Mr. Leone testified, or indicated in his responses to the officer's question, that he had just obtained the vehicle, had purchased it just two weeks earlier. And the officer opined that somebody who had just purchased a vehicle would try to keep it perhaps somewhat cleaner  And this leads me, Your Honor, to the issues regarding the responses to questions from Officer Gosnell. And we submit that those responses do suggest some evasiveness and do appear to be less than directly addressing the questions that the officer posed to Mr. Leone. And that evasiveness and that vagueness is revealed in the questions regarding where he was headed that day and also where he currently lived. And we set this out in our answer brief. And so that the general tone of Mr. Leone's responses He was asked where he was headed that day, and he said he was headed for Denver. Isn't that... What else is he supposed to say? He didn't say he was headed to Denver, Your Honor. What he said was, this is the video at minute 3, 3 minutes and 35 seconds. He says, quote, well, I want to go and stop at ISCOM Denver. I want to stop there, pick up some books, because I believe there's an event there. That doesn't indicate where he was headed. What Officer Gosnell indicated in his testimony... Counsel, how does that not indicate where he was headed? He mentioned Denver. Well, he indicated stop. In the officer's experience, he testified... He was asked where he was headed that day. He wasn't going to go to Minnesota that day. Right. And the officer never really asked him what the final destination was going to be. That's correct. We're not placing significant evidence. We're not placing significant weight on this testimony. I want to go and stop at ISCOM. It's a factor that the officer considered, because in the officer's experience, when he asked somebody where they're headed, he testified that they normally tell him where they're going to be staying that night or where they're going to be ending that night. So, again, we're not placing significant weight on it. It is a factor. And I note that I'm running out of time. By the way, I just want to make sure that I understand your position. You have this statement in your brief that you agreed about the dividing line when the question about mileage was asked. So I take it that the EPIC search and the results of that are not something that can be considered at this point. Do you agree with that? Yes, Your Honor. That's correct. We would ask that the court affirm the district court's ruling below. We submit that the district court correctly ruled that Officer Gosnell possessed a reasonable suspicion of criminal activity justifying extending the traffic stop and allowing for the dog sniff. Thank you. Two quick things. The explanation that Trooper Gosnell gave for why the difference between the license and the registration mattered was not that it somehow protects people higher up on the food chain in a drug trafficking organization. It was that it protects the driver of a third-party vehicle, and that doesn't make sense on the facts of this case. Also, while it is true that somebody can nickel and dime their way to reasonable suspicion, I've now exceeded my time. May I finish that thought? Yes, you may. When the government says a factor still counts, it has to amount to something. So if this court has said that messy cars, that food wrappers don't count, then they don't count. They don't get added in. If his responses were appropriate, they don't get added in at all. I understand the point. Thank you, Counsel. Thank you. Thank you, Counsel. Case is submitted. Counselor excused.